## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Nicholas Moore, Personal
Representative of the Estate of Cathy
Ajami-Moore, Deceased

                      Plaintiff,      No. 2:20-cv-11154

v.

                                   Chief Judge Denise Page Hood

Wellpath, a Kansas Limited Liability
Company, formerly known as Correct
Care Solutions LLC, County of
Macomb, *et al.*,

                      Defendants.

_____/

### Order Denying Defendants Wellpath, Dr. Shamael Haque, Laura Maurer-Hitzelburger, and Amber Stephenson-LaForest's Motion to Dismiss

On May 6, 2020, Plaintiff Nicholas Moore ("Plaintiff") filed the instant action pertaining to his wife Cathy Ajami-Moore's ("Ajami-Moore's") May 6, 2017 suicide during her incarceration in the Macomb County Jail.  He alleges constitutional violations under 42 U.S.C. § 1983 against Defendants ("Wellpath"), Dr. Shamael Haque ("Haque"), Laura Maurer-Hitzelburger[1] ("Maurer-Hitzelburger"), Amber Stephenson-Laforest ("Stephenson-LaForest"), Macomb County, Macomb County Sheriff Anthony Wickersham ("Wickersham"), and

_____

[1]      Although this Defendant's last name is listed in the caption as "Mauer," she is identified in the current motion as Maurer-Hitzelburger.

Captain Walter Zimny ("Zinny").   Plaintiff brings this action as the personal representative of the estate of Ajami-Moore.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff makes the following allegations in the Complaint.[2]  On October 17, 2016, Ajami-Moore was placed in the Macomb County Jail following a motor vehicle collision resulting in head injuries.  (ECF No. 1, PageID.11), ¶ 12.  The state court judge assigned to her criminal case ordered a forensic examination at which Ajami-Moore reported "life-long psychological problems," including multiple suicide attempts, bipolar disorder, depression, Attention Deficit Hyperactivity Disorder ("ADHD"), and a head trauma.  (*Id.*).  Defendant Wellpath, formerly known as Correct Care Solutions, LLC, has a contractual relationship with the Jail to provide mental health care services "including diagnoses, prognosis and treatment for inmates."  (*Id.*, PageID.2).  Ajami-Moore advised the screening staff at the Jail and staff of Wellpath of her psychological history and suicide attempts.   (*Id.*, PageID.12), ¶ 13.   Based on her responses to an intake questionnaire, she was classified as "high risk" and was placed in a video monitored mental health care unit cell until she was released on bond on October

---

[2]     Because claims against Defendants Macomb County, Wickersham, and Zimny have been settled, allegations against these Defendants are omitted from discussion.

25, 2016.  (*Id.*).   State district court criminal records describing the events leading to her incarceration show that Ajami-Moore was mentally unstable with a diagnosis of bipolar disorder and a "severe risk for self-harm."  (*Id.*), ¶ 14.

Ajami-Moore was reincarcerated on March 31, 2017 after engaging in "additional bizarre, irrational self-destructive behavior while on a law enforcement monitored tether . . ."  (*Id.*), ¶ 15.  At the time of the arrest, Ajami-Moore "was obviously in psychological distress and suicidal." (*Id.*).   Upon being incarcerated, Ajami-Moore "once again provided a lifelong history of psychological problems, self-harm and 32 suicide attempts including a suicide attempt while released on bond." (Id., PageID.13), ¶ 16.  She reported "psychological distress, feelings of hopelessness, distress and previous self-harm and the potential for further self-harm including suicide."  (*Id.*).   Both Macomb County Jail and Wellpath determined that she was "high risk" and placed her in a "video monitored" mental health unit cell.  (*Id.*).

Plaintiff alleges that although Ajami-Moore was classified as a high risk, she "was not seen or evaluated or treated" by a licensed psychiatrist, psychologist, or medical doctor during the incarcerations; never evaluated for the possible need for psychiatric hospitalization, "intense therapy," or a change in medication. (*Id.*), ¶ 17.  Although Dr. Haque prescribed psychotropic medication, she did not have

"physical or telephonic contact" with Dr. Haque. (Id., PageID.14), ¶ 17. Psychotropic medication prescribed to Ajami-Moore (Lamotrigine) was "well known and recognized by the [] Food and Drug Administration to increase the risk of suicide" for individuals experiencing bipolar disorder, "especially when . . . combined with Paxil," which had also been prescribed. (*Id.*). Ajami-Moore's use of Lamotrigine was not monitored by a physician or PA although she complained of known side effects of the drug including physical symptoms and anxiety. (*Id.*). None of the mental health professionals attending to Plaintiff "were properly qualified or licensed to provide counseling or any meaningful benefit." (*Id.*, PageID.15). Although Ajami-Moore was initially placed in a video monitored cell, at the time of her suicide she was housed in a cell without video monitoring of any part of the cell despite her high-risk status and the fact that cells with "increased video surveillance" were available. At the time of her suicide, she was assigned an upper bunk with a horizontal bar and provided with a bed sheet, although both the bar and sheet were "common suicidal implements" for incarcerated individuals. (*Id.*, PageID.16), ¶ 18. Due to damage to a "key scan" device, security rounds in the mental health unit were not documented. (*Id.*).

Plaintiff alleges further that at the time of the suicide, the lighting within the mental health unit was dim and interrupted by lack of motion; the mental health

staff was not "located or positioned" to view Ajami-Moore's cell; no auditory or video monitors were placed near her at the time of her suicide; and staff failed to provide access to physical activity, exercise, fresh air, or greater telephone contact with her husband. (*Id*., PageID.17-18). As a direct result, on the morning of May 6, 2017 Ajami-Moore hung herself with a bed sheet fashioned into a noose (*Id*., PageID.19), ¶ 21.

Plaintiff alleges that Defendant Wellpath "has established and displayed customs, policies and practices of deliberate indifference" toward known psychologically ill and distraught persons such as Ajami-Moore, "who posed the foreseeable risk and strong likelihood of self-harm including suicide while incarcerated." (Id., PageID.20), ¶ 21. Plaintiff alleges that Dr. Haque, an employee of Wellpath, prescribed psychotropic medication without actually seeing or speaking to Ajami-Moore or requesting psychological records and police reports which were "readily available and accessible." (*Id*., PageID.8), ¶ 8. Plaintiff alleges that Maurer-Hitzelburger and Stephenson-Laforest, mental health professionals employed by Wellpath, had "direct custodial responsibility as to the care and custody" of Ajami-Moore at the time of her death. (*Id*., PageID.10), ¶ 9. Plaintiff alleges that the failure to observe Ajami-Moore "through sight, sound or video monitoring" constitutes deliberate indifference to her medical needs. (*Id.*).

5

He notes that Ajami-Moore's body was discovered by a custodial officer and not Maurer-Hitzelburger or Stephenson-Laforest.  (*Id.*).  Plaintiff requests an award of damages and attorney fees.

On August 26, 2021, the Court approved a settlement of the claims against Macomb County, Wickersham, and Zimny and dismissed those Defendants with prejudice.  (ECF Nos. 44, 47).

## II.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss a complaint for failure to state a claim upon which relief can be granted.  Federal Rule of Civil Procedure 8(a) sets forth the federal pleading requirement that a pleading "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible.  Bare assertions of legal liability absent some corresponding facts are insufficient to state a claim." *Agema v. City of Allegan*, 826 F.3d 326, 331(6thCir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has a facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

### III.  Analysis

Defendants Wellpath, Dr. Haque, Maurer-Hitzelburger, and Stephenson-Laforest argue that because Plaintiff has not made a plausible claim that they were deliberately indifferent to Ajami-Moore's medical needs, they are entitled to dismissal under Fed. R. Civ. P. 12(b)(6) (ECF No. 17).

### A.  Applicable Law

"While a pretrial detainee does not enjoy protection of the Eighth Amendment, the Eighth Amendment, rights of prisoners are analogous to pretrial detainees' due process rights under the Fourteenth Amendment."  *Barber v. City of Salem, Ohio*, 953 F.2d 232, 235, 1992 WL 782 (6th Cir. 1992).   The question of whether Defendant's conduct in this case was unconstitutional is therefore analyzed under Eighth Amendment principles.

The Supreme Court has held that prisoners have a constitutional right, under the Eighth Amendment, to medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

Prison officials may not act with deliberate indifference to the medical needs of their prisoners. *Id.* at 104. An Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id.* The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Deliberate indifference "entails something more than mere negligence," *id.* at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837.

Mere medical malpractice does not rise to the level of an Eighth Amendment violation. *See Estelle v. Gamble, supra*, 429 U.S. at 105–106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim

is a prisoner"). The Sixth Circuit has also observed that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are *generally* reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 at n. 5 (6th Cir. 1976)(emphasis added). However, even where some treatment has been provided, a plaintiff can "establish the objective component by showing that the prison ... provided treatment 'so cursory as to amount to no treatment at all.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)(*quoting Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009)).

## B. Dr. Haque

Defendants argue that Plaintiff's allegations that Dr. Haque was not qualified to assess Ajami-Moore, that Dr. Haque did not examine Ajami-Moore, that he did not inquire about outside mental health services or obtain mental health or court records are either untrue or do not rise to the level of a constitutional violation. (ECF No. 17, PageID.113-114). In response, Plaintiff argues that Dr. Haque's failure to provide adequate treatment and take precautions in light of Ajami-Moore's well-documented history of mental instability and suicide attempts amounts to deliberate indifference. (ECF No. 31).

As a threshold matter, Plaintiff's allegation that Dr. Haque never examined Ajami-Moore (ECF No. 1, PageID.13), ¶ 17, is contradicted by the medical records stating that he examined her two days before her death on May 4, 2017.  (ECF No. 36, PageID.348).  His notes state that Ajami-Moore was fully oriented and denied suicidal ideation but was anxious and lonely.  (Id., PageID.348-350).  He did not complete the portion of the checklist form measuring "mood" and under "affect," checked the box "other." (*Id*., PageID.348).  He noted that her response to treatment had been "fair." (*Id.*, PageID.349).

However, the fact that Dr. Haque examined Ajami-Moore does not by itself mean that her care was constitutionally adequate. First, Plaintiff has pled facts that Ajami-Moore had a known history of mental health problems, including multiple suicide attempts. Under the objective test for deliberate indifference, her history and mental state constitute a serious medical need. *See Comstock*, 273 F.3d at 702 (*citing Yellow Horse v. Pennington Cty.,* 225 F.3d 923, 927 (8th Cir.2000)), which held that prisoner "had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to").

The more critical question is whether Plaintiff's facts raise a plausible claim of deliberate indifference under the subjective test, that is, did Plaintiff "allege

facts which, if true, would show that [Dr. Haque] subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Farmer*, 511 U.S. at 837.

Again, Plaintiff's allegation that Dr. Haque *never* met with or examined Ajami-Moore is contradicted by jail medical records showing that he examined her two days before her suicide.[3] Therefore, that particular allegation will be disregarded and the issue will be analyzed with respect to Plaintiff's remaining factual allegations.

First, Plaintiff has alleged facts plausibly showing that Dr. Haque "subjectively perceived" that Ajami-Moore presented a substantial risk of suicide:

-Upon initial admission to the Jail, Ajami-Moore advised Wellpath personnel of her "psychological and suicidal history." (ECF No. 1, PageID.12, ¶ 13). She was placed in a video-monitored Mental Health Unit cell. (*Id.*).

-Plaintiff was released on bond but was returned to the Jail after her bond was revoked. On readmission, she "once again provided a lifelong history of psychological problems, self-harm and 32 suicide

_____

[3] In ruling on a Rule 12(b)(6) motion, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997), *overruled on other grounds, Swierkiwica v. Sorema, N.A.,* 534 U.S. 506 (2002). Information in Ajami-Moore's medical records from the Macomb County was referenced in the Complaint, and that information is central to Plaintiff's deliberate indifference claim.   Both Defendants and Plaintiff have submitted medical records and the Court may properly consider them in deciding this motion.

attempts including a suicide attempt while released on bond." (*Id.*, PageID.12-13, ¶ 15-16). Wellpath screened her on or about March 31, 2017, and again determining her to be at high risk for suicide, placed her in a video-monitored cell. (*Id.*).

These allegations are substantiated by Ajami-Moore's medical records from the jail, which reflect that she informed Wellpath personnel of her psychiatric history, including multiple suicide attempts, and that it was recommended by Wellpath personnel that she be given anti-suicidal apparel and placed in a high-observation cell from March 31, 2017 to April 5, 2017. (ECF No. 36, PageID.355, 357-363)(filed under seal). Records from April 1, 2017 states that Plaintiff reported that her most recent suicide attempt was "2-3 weeks ago by hanging." (*Id.*, PageID.359). Therefore, Plaintiff has plausibly alleged that Dr. Haque was aware of and perceived the facts indicating that Ajami-Moore was at risk for suicide, and from those facts drew the inference that she was at risk; that is why, at least initially, she was placed in a high-observation cell.

The next question under the subjective prong is whether Dr. Haque, having drawn the inference that Ajami-Moore was a suicide risk, disregarded that risk. Dr. Haque argues that because Ajami-Moore received medical attention, including medication, her claim is merely a dispute over the adequacy of the treatment, quoting *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976), to the effect that "where a prisoner has received some medical attention and the dispute is over the

adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." (ECF No. 17, PageID.119).

Dr. Haque is correct that as a general principle, mere negligence or medical malpractice does not rise to the level of an Eighth or Fourteenth Amendment violation. *See Estelle v. Gamble,* 429 U.S. at 105–106. However, deliberate indifference is not restricted to cases where there is a complete absence of care, and the fact that an inmate receives *some* level of medical attention does not preclude constitutional scrutiny of the quality of that care. That assessment necessitates a factual inquiry.

In *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989), the issue was whether "decisions to remove [the prisoner] from medication and to restore the medication without Lithium constituted deliberate indifference to [his] psychiatric condition." Affirming a denial of summary judgment, the Eleventh Circuit stated, "We cannot determine ... whether [the doctor's] treatment constituted deliberate indifference to Waldrop's serious psychiatric needs because that treatment must be evaluated according to professional standards," and thus "there is a disputed issue of material fact regarding the quality of care ... provided to [the prisoner]." *Id.* *Waldrop* relied in part on *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986),

where the Court held that "[w]hether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses."

In *Terrance v. Northville Regional Psychiatric Hosp.,* 286 F.3d 834, 844 (6th Cir.2002), a case also involving a claim of deliberate indifference to a prisoner's psychiatric needs, the Sixth Circuit relied on *Waldrop* in reversing a grant of summary judgment:

> "The [*Waldrop* ] court stated that the relevant inquiry as to whether the defendants provided grossly inadequate care was 'whether a reasonable doctor ... could have concluded his actions were lawful.' *Id.* at 1034. In *Waldrop,* the court affirmed the denial of defendants' motion for summary judgment in a § 1983 action finding that a particularized, fact-specific inquiry was a necessity to the proper analysis of plaintiff's claim. Here, as in that case, the proper analysis of Terrance's claim requires a similar inquiry."

In *Atchison v. Cruz*, 2011 WL 893096 (E.D. Mich., Jan. 24, 2011)(Whalen, M.J.), *Report and Recommendation adopted* 2011 WL 900305 (Rosen, C.J.), the plaintiff, ordered detained in a federal criminal case, was initially housed at local jail, where he unsuccessfully attempted suicide. He was later transferred to the Federal Detention Center in Milan, Michigan, where he was examined by staff psychologists and physician's assistants, all of whom noted his recent suicide attempt. After he was taken off suicide watch he committed suicide by hanging himself. Citing *Waldrop*, *Rogers,* and *Terrance*, the Court found that even though

14

plaintiff had received psychological evaluations prior to being taken off suicide watch, the question of whether the defendants' actions rose to the level of deliberate indifference required further factual development.

In the present case, there are likewise unresolved factual questions regarding the issue of deliberate indifference.  A post-mortem summation performed by Wellpath (known as Correct Care Solutions at the time of the suicide), also illustrates that additional factual inquiry is required.  Although the summary makes reference to Ajami-Moore's contact with Wellpath employees on April 6, 10, 21, and 30, 2017, Defendants' motion to dismiss does not offer or reference documentation regarding these visits.  In response, Plaintiff offers one, largely illegible record from April 6 (ECF No. 36, PageID.330-332, 348).  The post-mortem summation also makes reference to Plaintiff's long history of suicide attempts.  Despite Ajami-Moore's history of major depressive disorder, bipolar disorder, and suicide attempts, Dr. Haque prescribed lamotrigine, an anti-epileptic medication, which is "recognized by the US Food and Drug Administration to increase the risk of suicide for acutely Bi-Polar persons…especially when lamotrigine is combined with Paxil, which was also prescribed by Dr. Shamael Haque MD." *Complaint*, ECF No. 1, PageID.14, ¶ 17(D). Would a reasonable doctor conclude that the off-label use of lamotrigine was lawful, especially when

combined with Paxil? Was prescribing these drugs for someone with Ajami-Moore's history and diagnosis consistent with professional standards?[4]

In addition, Ajami-Moore was not only removed from the high-observation cell, but was placed in a cell that made a successful suicide attempt more likely. In the complaint, Plaintiff alleges at ¶ 18:

> (B) [Ajami-Moore] was placed in a cell that had an upper bunk with a horizontal bar that could readily be used to hang herself.
>
> ( C ) [Ajami-Moore] was provided the most common suicidal implement for suicidal jailed persons: a thin cloth bed sheet.

(ECF No. 1, PageID.16).

Was Dr. Haque aware of the conditions Ajami-Moore would be subjected to if removed from the high-observation cell?  If so, did his decision to subject her to those conditions, with knowledge of her past suicide attempts, amount to deliberate indifference? These are all factual questions that may be answered or refined through discovery, including expert discovery. As the Court stated in *Atchison*,

> Once the facts are fleshed out through discovery—including expert discovery—the balance may tip in favor of one party or the other, but at this early stage of the litigation, the amended complaint on its face states a plausible claim of deliberate indifference....

---

[4] Plaintiff also alleges that Dr. Haque failed to obtain Ajami-Moore's past medical records, including a recent psychological evaluation by the Forensic Center. (ECF No. 1, PageID.15, ¶ 17(G).

*Atchison* at \*6.  The motion to dismiss Dr. Haque under Rule 12(b)(6) is denied.

### C.  Maurer-Hitzelburger and Stephenson-Laforest

Defendants Maurer-Hitzelburger and Stephenson-Laforest were mental health professionals employed by Wellpath.  Plaintiff alleges that on the morning of May 5, 2017, they "had direct custodial responsibility as to the care and custody of [Ajami-Moore]."[5] (ECF No. 1, PageID.10, ¶ 9).  He alleges that they "were assigned the duty to make frequent individual observation of the Mental Health unit at least apparently every 15 minutes and these Defendants had the duty to individually observe [Ajami-Moore]."  *Id*.   Plaintiff alleges that Maurer-Hitzelburger and Stephenson-Laforest failed to make those rounds on the morning of Ajami-Moore's suicide, and that "although specifically assigned to the Mental Health Unit, [they] did not discover [Ajami-Moore's] suicide until a Macomb County Sheriff Deputy made the discovery." (*Id*., PageID.37, ¶ 29).  Plaintiff alleges that Maurer-Hitzelburger and Stephenson-Laforest placed Ajami-Moore in a cell without video monitoring that "had an upper bunk with a horizontal bar that could readily be used to hang herself." He alleges that these Defendants "provided or allowed [Ajami-Moore] to retain and use the most common suicidal implement for suicidal jailed persons: a thin cloth bed sheet." *Id*., PageID.38.

---

[5] The record shows, Ajami-Moore committed suicide on the morning of May 6, 2017.  The reference to May 5 is apparently a scrivener's error.

These allegations support a plausible theory of deliberate indifference.  For the reasons discussed above, Ajami-Moore's psychological conditions and suicidal tendencies constitute a serious medical condition, satisfying the objective prong of a deliberate indifference claim. As to the subjective prong, as mental health professionals assigned to Ajami-Moore's unit, these Defendants, mental health professionals working in the mental health unit on the day of the suicide, would have been aware of her psychological issues and Ajami-Moore's suicide attempts. (ECF No. 36, PageID.342).  They would have been aware that she had previously been in a close-observation cell.   Indeed, it was Maurer-Hitzelburger who recommended on March 31, 2017 that Ajami-Moore be placed on "high observation status for active suicidal behavior/verbalizations," suicide apparel, and a "high observation cell assignment" with monitor.  (ECF No. 36, PageID.358) and three days later found that Ajami-Moore was still a "potential suicidal risk" (*Id*., PageID. 362).  A March 20, 2017 competency evaluation submitted to the court in Ajami-Moore's pending criminal case states that she made "multiple suicide attempts as a child and adult," including an attempt to hang herself and taking an overdose of over-the-counter drugs since facing the current charges.   (*Id*., PageID.319).   Yet, the Jail's "Mental Health Log-Book Review" shows that between the time Ajami-Moore was observed writing (what turned out to be her

18

suicide note) at 9:15 a.m. and the 10:10 a.m. discovery of her body, she was not monitored by either Defendant.  (*Id*., PageID.342).  Again, while a post-mortem summary by Wellpath makes reference to four separate evaluations by Wellpath employees between April 5 and May 4, 2017, Defendants have not produced these documents in support of the current motion.  As with Dr. Haque, they were aware of facts from which they drew the inference that Ajami-Moore required specific care and monitoring because of the risk of suicide.

Finally, the allegations against these Defendants, which are presumed to be true for purposes of a Rule 12(b)(6) motion, plausibly show that they knowingly disregarded that risk. They are alleged to have neglected their duty by failing to adequately monitor Ajami-Moore on a regular basis.  It is also alleged that these Defendants allowed Ajami-Moore to be provided with sheets-the instrumentality of her suicide-even knowing that the cell with a horizontal bar that could be used to attach the makeshift noose. Giving a mentally ill prisoner with a known history of multiple suicide attempts the means and opportunity to kill herself plausibly makes out a claim of deliberate indifference.

As with Dr. Haque, the claims against Maurer-Hitzelburger and Stephenson-Laforest may or may not survive following discovery, but at this stage, dismissal under Rule 12(b)(6) is denied.

### D. Wellpath

Plaintiff alleges that Wellpath "did not provide or offer competent, licensed, experienced and trained medical and psychological care or properly educated and trained personnel" to Ajami-Moore, characterizing her suicide as the result of "an egregious total collapse of institutional safeguards designed to protect inmates with severe and known previous suicide attempts and severe self-revealed psychological problems." (ECF No. 31, PageID.204).

In *Monell v. Department of Social Services.*, 436 U.S. 658, 692 (1978) the Supreme Court specifically held that in a § 1983 action, liability cannot be based on a theory of respondeat superior, or mere supervisory or municipal liability. However, corporate or institutional liability may "be premised on some policy that caused a deprivation of [a plaintiff's] Eighth Amendment rights." *Starcher v. Correctional Medical Services*, 7 Fed. Appx. 459, 465 (6th Cir. 2001); *Monell* at 638. A policy need not be formal or written to bring § 1983 into play. It can be found in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)(citations omitted). Private entities like Wellpath "contracted to perform the traditional state function of prison medical care . . . may be sued for

constitutional violations." *Baker v. Stevenson*, 605 F. App'x 514, 520, 2015 WL 1404854 (6th Cir. March 30, 2015)(*citing Johnson v. Karnes,* 398 F.3d 868, 877 (6th Cir.2005). Wellpath "cannot be held liable on a theory of *respondeat superior,* but it can be held liable on the basis of a corporate policy, practice, or custom that causes the plaintiff's injury."

Plaintiff alleges that Wellpath has established and displayed customs, policies, and practices of deliberate indifference toward known psychologically ill and distraught persons, including Ajami-Moore. Plaintiff alleges that Ms. Ajami-Moore posed the foreseeable risk and strong likelihood of self-harm, including suicide, while incarcerated at the Macomb County Jail and under Wellpath's mental health care.

Whether Plaintiff has offered plausible allegations of municipal liability by Wellpath is a closer question.  Plaintiff alleges several lapses in the care of Ajami-Moore by the individual Defendants employed by Wellpath.  While Defendants and the other Wellpath individuals assessing Ajami-Moore's condition appear to hold advanced degrees and in Dr. Haque's case, is licensed to practice medicine, Plaintiff's allegation that Wellpath did not provide these individuals adequate training in evaluating and treating suicidal individuals *in the prison setting* is at a minimum plausible, given multiple individual Defendants' failure to prevent the

suicide of an individual who had already made multiple attempts in the previous six months. "At this stage of the proceeding the Court must take Plaintiff's [municipal] allegations as true." *Hall v. Raja*, 2011 WL 7975464, at *6 (E.D. Mich. October 7, 2011) (*report and recommendation adopted*, 2012 WL 1033417 (E.D. Mich. March 27, 2012))("Whether or not discovery will serve to prove Plaintiff's allegations ... remains to be seen" but "a motion to dismiss is not the appropriate vehicle to adjudicate Plaintiff's claims"). The Court is mindful that a government contractor cannot "be held liable *solely* because it employs a tortfeasor," *see Monell*, *supra*, 436 U.S. at 691. However, here, the allegations that the lack of care leading to Ajami-Moore's suicide was the result of *multiple* failures to act by *multiple* individuals employed by Wellpath. Plaintiff's allegations of repeated institutional failures states a plausible claim of deliberate indifference by Wellpath, as well as by the individual Defendants. The motion to dismiss is be denied as to Defendant Wellpath.

## IV. CONCLUSION

For the reasons stated above,

IT IS ORDERED the motion to dismiss (ECF No. 17) is DENIED as to

Defendants Wellpath, Haque, Maurer-Hitzelburger, and Stephenson-Laforest.


s/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: January 30, 2023